AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico ▼

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

SEE ATTACHMENT A FOR THE FOUR LOCATIONS
AND THREE PERSONS TO BE SEARCHED

)
)
)
)
)
)

Case No. **22 MR 1790-22 MR 1796**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of _____**New Mexico**_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a), 843(b), 846, 856, and 18 U.S.C. §§ 922(g) and 924(c) | PWITD fentanyl and methamphetamine, use of a communication facility in furtherance of drug crime, conspiracy, operating a drug house, prohibited person in possession of a firearm or ammunition, and possession of a firearm in furtherance of a drug trafficking crime. |

The application is based on these facts:

Refer to the attached Affidavit in Support of an Application for Search Warrants

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Acee, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
email and telephone _____ *(specify reliable electronic means)*.

Date: __12/2/2022__

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Steven C. Yarbrough, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

## INTRODUCTION

1.      I, Bryan Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises (hereinafter referred to as the "Subject Premises"):

> **Location 1:** 8112 Kathryn Street SE, Albuquerque, New Mexico 87108
>
> **Location 2:** 620 Chama Street SE, apartment #E, Albuquerque, New Mexico 87108
>
> **Location 3:** 1101 High Street SE, apartment #A, Albuquerque, New Mexico 87102
>
> **Location 4:** Cube Smart Storage, 2001 Girard Boulevard SE, unit D20, Albuquerque, New Mexico 87106

2.      More detailed descriptions and photographs of the Subject Premises are contained within "Attachment A," which has been attached hereto and incorporated herein by this reference.

3.      I am also requesting the Court's permission to collect DNA buccal swabs from:

4.      **Person 1:** JEFFREY ALAN CHAVEZ, aka: "40,"

5.      **Person 2:** GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," and

6.      **Person 3:** CRYSTAL NICHOLE MEDINA.

7.      The DNA evidence will be analyzed against drug packaging materials collected by an undercover FBI agent during undercover drug buys (explained further herein), as well as any drug packaging materials or firearms collected during the execution of the requested search warrants.

8.      Photographs of the aforementioned subjects have been included in Attachment A, which has been attached hereto and incorporated herein by this reference.

## PURPOSE OF THE AFFIDAVIT

9.      The FBI Albuquerque Violent Gang Task Force (VGTF) has been engaged in the investigation of JEFFREY ALAN CHAVEZ, aka: "40," GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," CRYSTAL NICHOLE MEDINA, FNU LNU, aka: "GÜERA,"[1] (hereinafter the "Target Subjects") and others, all of whom are involved in the distribution of fentanyl and methamphetamine within the District of New Mexico. This affidavit is submitted in support of <u>seven</u> warrants to search the Target Subjects and Subject Premises, which are believed to contain evidence of violations of:

    a)  21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

    b)  21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking;

    c)  21 U.S.C. § 846 conspiracy to distribute controlled substances;

    d)  21 U.S.C. § 856 maintaining drug involved premises;

    e)  18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; and

    f)  18 U.S.C. § 922(g) being a prohibited person in possession of a firearm or ammunition.

The violations listed above shall be referenced as the "Target Offenses" hereinafter.

10.     I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

---

[1] FNU LNU - First Name Unknown, Last Name Unknown. "Güera" is Spanish slang for white girl.[1]

a.  Information from FBI undercover employees and Confidential Human Sources (CHS for both plural and singular);

b.  Information provided by law enforcement or corrections officials;

c.  Results of physical and electronic surveillance;

d.  Information derived from consensually recorded conversations;

e.  Records from the FBI National Crime Information Center (NCIC), New Mexico Corrections Department, New Mexico Courts, Oklahoma Courts, and the New Mexico Motor Vehicle Division.

11.     Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, detectives, intelligence analysts, institutional gang investigators, or CHS that assisted law enforcement. All figures, times, weights, and calculations set forth herein are approximate.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

12.     I have been a law enforcement officer for more than 22 years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and have primarily worked transnational organized crime, violent crime, and gangs. Over the past 22 years, I have arrested several hundred persons for offenses related to drug distribution, gang crimes, racketeering offences, firearm violations, homicide, armed robbery, carjacking, assault, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar with how those individuals and organizations conceal the often substantial profits generated from their criminal activities.

13.     I served as the lead FBI case agent in the government's 2010-2014 Continuing Criminal

Enterprise Drug Kingpin Act case against the Cartel de Juarez (or Juarez Cartel), which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders. Several cartel leaders were extradited to the United States. Other cartel leaders are pending extradition to the United States.

14.     I am the lead case agent in the government's 2015-2022 gang racketeering case against the Sindicato de Nuevo Mexico (SNM) prison gang, which encompasses substantial drug trafficking activities, firearm-related offenses, and numerous homicides. To date, 170 SNM members and associates have been arrested and 12 gang related homicides were charged as federal racketeering murders.

15.     I have qualified, in federal and state court, as an expert witness on drug trafficking, possession with intent to distribute controlled substances, and the Juarez Cartel. I have also qualified in federal court as an expert witness regarding firearms, ammunition, interstate nexus, and firearm possession as it relates to drug trafficking. I am an FBI subject matter expert on the Juarez Cartel and SNM.

16.     I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, California Narcotic Officers Association, California Gang Investigators Association, Southern California Outlaw Motorcycle Gang Task Force, International Outlaw Motorcycle Gang Task Force, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

**BACKGROUND ALLEGATIONS REGARDING GANGS AND DRUG TRAFFICKERS**

17.     Based upon my training, experience, and participation in this investigation, as well as the investigation of other gang/criminal enterprises and DTOs, I am aware of the following information:

a)   Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

b)   Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often

keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

c)  I am aware gang members aggressively pursue informants, suspected informants, and persons who betray the gang(s). I am aware gang members relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail."

d)  I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood corrections officers will monitor the call.

e)  I know that members and associates of gang/criminal enterprises and DTOs maintain stash houses, rental properties, apartments, storage units, and similar assemblies to store controlled substances and drug proceeds.

f)  In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities.  Members of gang/criminal enterprises and DTOs often use the

same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement.

g) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

h) Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and

diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

i)  Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

j)  I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang members and they are expected to possess and maintain firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

k)  I know that fingerprints and DNA evidence may be transferred to drug packaging materials, firearms, and ammunition.

18.   The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences, stash houses, and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## THE SUBJECT PREMISES

19.     Subject Premises 1: **8112 Kathryn Street SE, Albuquerque, NM 87108** may be described as a single-story residence with pink siding. The numbers 8112 are posted on the curb and mailbox in front of the residence. Color photographs of the location have been included in Attachment A. I believe Target Subjects JEFFREY ALAN CHAVEZ, aka: "40," and GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," manage drug and firearm sales from this residence.

20.     Subject Premises 2: **620 Chama SE, apartment #E, Albuquerque, NM 87108** may be described as being a two-story apartment building with tan colored siding. The number 620 is posted on the front of the building and the letter E next to the front door. Color photographs of the location have been included in Attachment A. I believe Target Subjects JEFFREY ALAN CHAVEZ, aka: "40," and CRYSTAL NICHOLE MEDINA manage drug sales from this apartment.

21.     Subject Premises 3: **1101 High Street SE, apartment #A, Albuquerque, NM 87102** may be described as being a two-story apartment building with tan and red colored siding. The number 1101 is posted on the front and side of the building. Apartment A is located on the north end of the building, and is distinguishable because apartments B, C, and D have letters on the front doors. Apartment A does not have a letter on the door, as it looks like a replacement door. Color photographs of the location have been included in Attachment A. I believe Target Subjects JEFFREY ALAN CHAVEZ, aka: "40," and FNU LNU, aka: "GÜERA," manage drug sales from this apartment.

22.     Subject Premises 4: **Cube Smart Storage, 2001 Girard Boulevard SE, unit D20, Albuquerque, NM 87106** may be described as a commercial storage facility with a large red and white sign in front of the business entrance. Each storage unit is individually marked with letters

and numbers. Color photographs of the location have been included in Attachment A. I believe

Target Subject JEFFREY ALAN CHAVEZ, aka: "40," stores firearms and drug proceeds in the

form of stolen property and personal property at this storage unit.[2]

### FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

23.     In October 2022, I was contacted by a CHS[3] who advised JEFFERY ALAN CHAVEZ,

aka: "40," was serving as a drug source of supply to several gang members and street level dealers

in southeast Albuquerque. The CHS described CHAVEZ as a Paisa gang member who had served

time in prison in Oklahoma and New Mexico. I queried CHAVEZ' cellular telephone number in

FBI databases and learned he had been in frequent communication with several current and former

FBI investigative targets, to include JAMES CASIDY CANGRO, aka: "HAVIC," a recent VGTF

target who has pending drug trafficking charges in the Southern District of California and District

of New Mexico.[4]

---

[2] Agents spoke with a manager at the Cube Smart Storage and confirmed unit D20 is currently being rented by CHAVEZ.

[3] The CHS has been cooperating with the FBI for approximately six years and has testified as a government witness in numerous federal jury trials. The CHS is an experienced informant and has conducted controlled buys, introduced undercover agents to targets of FBI investigations, worn covert FBI recording devices on the street and in a maximum-security prison facility. The CHS does not have any pending charges and has received approximately $12,000 in financial assistance from the FBI. The CHS has felony convictions for murder, armed robbery, aggravated battery, trafficking a controlled substance, and possession of a controlled substance. I found information from the CHS to be reliable because much of it was corroborated by independent source information, undercover FBI agents, other law enforcement investigations, controlled drug buys, and physical and electronic surveillance. To my knowledge, the CHS's information has not been found to be false or misleading.

[4] CANGRO was a validated member of the Soldiers of Aryan Culture (SAC) prison gang and subject of a VGTF investigation. The VGTF attempted to execute search and arrest warrants on CANGRO in Albuquerque earlier this year; however, he was not home at the time. Agents located numerous firearms, distribution quantities of methamphetamine, and other drugs in CANGRO's residence. Coincidently, FBI agents in San Diego, California, arrested CANGRO that same day

24.    I advised the CHS to maintain contact with CHAVEZ and attempt to learn more about CHAVEZ' operation. The CHS did so and in the weeks that followed, reported the following information:

    a.  CHAVEZ was leading a neighborhood DTO in the "Warzone" (southeast Albuquerque) and was operating at least three drug houses, all of which the CHS was able to visit numerous times (Subject Premises 1-3);

    b.  CHAVEZ had two women, one of whom was his girlfriend, selling for him from apartments in southeast Albuquerque (Subject Premises 2-3);

    c.  CHAVEZ and his workers maintained several firearms at their distribution sites (Subject Premises 1-3);

    d.  CHAVEZ maintained a storage shed that contained stolen property, which had been accumulated as payment for drugs (Subject Premises 4);

    e.  CHAVEZ had direct contact with a cartel representative in Mexico, who CHAVEZ regularly communicated with;

    f.  CHAVEZ and his cartel boss discussed the fact the cartel took much of the month of December off and CHAVEZ would be receiving extra drugs to sustain his operation until the cartel resumed shipments in January;

    g.  CHAVEZ needed drivers to go to Arizona to transport vehicles with drugs back to Albuquerque;

    h.  CHAVEZ was recently summoned to Mexico to answer for missing drug payments and was exposed to some harsh treatment by the cartel;

---

after U.S. Customs and Border Protection officers discovered CANGRO entering the U.S. at a California port of entry. He was arrested on his FBI Albuquerque warrant and discovered to be in possession of methamphetamine and fentanyl.

   i.   CHAVEZ and LARA-YANEZ recently drove two stolen trucks from Albuquerque to Colorado at the direction of the cartel;

   j.   the CHS has been present on multiple occasions when the Target Subjects received, inventoried, packaged, distributed, or otherwise handled bulk quantities of methamphetamine and/or fentanyl at Subject Premises 1-3; and

   k.   the CHS reported the Target Subjects utilized cellular telephones to communicate with one another and their customers.

**On-Going Drug Distribution and Unlawful Firearms Possession at the Subject Premises:**

25.    Over the past month, the CHS has been present on more than a dozen occasions when the Target Subjects sold drugs to other persons at Subject Premises 1-3 (the residences). The CHS accompanied CHAVEZ to Subject Premises 4 (the storage facility) on several occasions and observed CHAVEZ place firearms, power tools, and other valuable items of personal property into Subject Premises 4. CHAVEZ told the CHS many of the items were "hot" and had been provided to CHAVEZ by his drug clients in exchange for drugs. Since November 21, 2022, the CHS visited the storage shed and noted the firearms, power tools, and other items were still there.[5]

26.    The CHS explained LARA-YANEZ primarily ran drug sales at Subject Premises 1 (8112 Kathryn Street SE, Albuquerque). Moreover, LARA-YANEZ also sold firearms from Subject Premises 1. Since November 21, 2022, the CHS has been inside Subject Premises 1 and observed methamphetamine, fentanyl, and firearms inside the house.

27.    The CHS explained MEDINA primarily ran drug sales from Subject Premises 2 (620 Chama Street SE, apartment #E, Albuquerque). The CHS said MEDINA often stayed at Subject

---

[5] The exact date is known to me; however, it has been omitted herein to protect the CHS.

Premises 2 with CHAVEZ; however, not on a fulltime basis because MEDINA was on probation and her residence of record was in Los Lunas, NM. The CHS said MEDINA would stay in Los Lunas when her probation officer was scheduled to visit her.[6] Since November 21, 2022, the CHS has been inside Subject Premises 2 and observed methamphetamine, fentanyl, and firearms inside the apartment.

28.     The CHS explained FNU LNU, aka: "Güera," primarily ran drug sales from Subject Premises 3 (1101 High Street SE, apartment #A, Albuquerque). The CHS said Güera lived at Subject Premises 3 and described her as being a white, female, adult, in her mid-20's, about 5' 6" in height, slender in build, with greenish-blue eyes and blond-brown hair. The CHS said Güera had a distinct "bird" shaped nose. Since November 21, 2022, the CHS has been inside Subject Premises 3 and observed methamphetamine and fentanyl inside the apartment.

### The Undercover Drug Buys

29.     Several weeks ago, the CHS introduced an FBI Undercover Employee (UCE) to CHAVEZ and LARA-YANEZ. The UCE posed as a drug dealer involved in trafficking methamphetamine and fentanyl to a community in northern New Mexico for distribution. The CHS told CHAVEZ the UCE needed a steady source of supply. CHAVEZ indicated he was eager to meet the UCE and could meet the UCE's drug demands.

---

[6] I verified MEDINA is currently on probation under the supervision of the New Mexico Corrections Department (NMCD) Probation-Parole Division (PPD) for aggravated assault with a deadly weapon, negligent use of a deadly weapon, tampering with evidence, and driving under the influence, 13th Judicial District Court (Valencia County) Case No. D-1314-CR-2019-00643. I spoke with a supervisor with NMCD PPD and verified CHAVEZ' residence of record was in Los Lunas, where she reportedly lived with her parents. PPD records indicated CHAVEZ was only being contacted at her residence of record one time per month.

30.     **Drug Buy #1:** In early November 2022, the CHS and UCE met CHAVEZ and LARA-
YANEZ at Subject Premises 1 (8112 Kathryn Street SE, Albuquerque), as per CHAVEZ'
instructions. Prior to the meeting, CHAVEZ agreed to sell the UCE five ounces of
methamphetamine for $1,750 ($350 per ounce) and five boats of fentanyl for $7,500 ($1,500 per
boat / one boat = 1,000 pills).

31.     The CHS and the CHS's property were searched by agents prior to the meeting, with
negative results. After arriving at Subject Premises 1, the CHS and UCE met with CHAVEZ and
LARA-YANEZ in the living room of the house. CHAVEZ provided the UCE with five ounces of
methamphetamine and five "boats" (5,000 pills). CHAVEZ weighed the drugs before providing
them to the UCE in plastic bags. LARA-YANEZ stood nearby smoking methamphetamine and
offering the UCE some. LARA-YANEZ moved between the drug deal in the living room and a
nearby table, where he handled several firearms. LARA-YANEZ showed the CHS and UCE
several firearms, to include an AR-15 pistol, short barrel shotgun, and multiple pistols. Before
concluding the deal, CHAVEZ indicated one of the bags of fentanyl pills might be short and
mentioned that to the UCE and LARA-YANEZ. LARA-YANEZ then went into a back bedroom
and retrieved five smaller bags of fentanyl pills and provided them to the UCE. The UCE paid the
men $9,250 for the drugs.  The UCE and CHS then departed the location and met with VGTF
agents at a prearranged location. The CHS was searched with negative results. Field tests were
conducted on the drugs with positive results and then the drugs were placed in FBI evidence. The
weight of the methamphetamine was 141.4 grams and the fentanyl was 550.1 grams.

32.     **Drug Buy #2:** In late November 2022, the UCE communicated with CHAVEZ via text
messaging and requested to purchase one pound of methamphetamine. CHAVEZ indicated he
would supply the UCE with the requested drugs, as well as an additional amount of fentanyl pills

because one of the previously purchased boats of fentanyl was short a couple hundred pills. The UCE and CHAVEZ met at a restaurant in Albuquerque. MEDINA accompanied CHAVEZ to the deal and remained in the passenger seat of her white 2015 BMW (NM license plate BHZT37) while CHAVEZ got out and met with the UCE. CHAVEZ mistakenly brought the wrong drug order to the meeting, which consisted of eight ounces of methamphetamine and eights boats of fentanyl (8,000 pills). Surveillance agents and the UCE observed large plastic bags of blue pills bulging out of CHAVEZ' pants as he approached the UCE. The UCE explained the UCE had requested one pound of methamphetamine. CHAVEZ apologized for mixing up the order. The UCE purchased the eight ounces of methamphetamine for $1,200 and the 1,000 fentanyl pills for $1,490. The UCE then departed the location and met with other agents to check the drugs into FBI evidence. The weight of the methamphetamine was 236 grams and the fentanyl was 112.1 grams.

33.     Following the undercover deal, CHAVEZ drove at a high rate of speed to Subject Premises 2 (620 Chama Street SE, apartment #E, Albuquerque), where he and MEDINA went into the apartment and remained until surveillance was terminated.

34.     **Pending Drug Buy:** The UCE communicated with CHAVEZ this week and is scheduled to purchase of one pound of methamphetamine and eight boats of fentanyl next week. CHAVEZ has repeatedly communicated to the UCE that he can supply the UCE with whatever the UCE needed. I am planning on having the undercover drug buy coincide with the service of the requested search warrants.

35.     **Arrest Warrants**: On December 1, 2022, I obtained a criminal complaint and arrest warrants for CHAVEZ and LARA-YANEZ for their participation in the aforementioned undercover drug deals. The complaint and warrants were approved by United States Magistrate Judge Steven C. Yarbrough, Case No. 22-MJ-1777-SCY.

### THE TARGET SUBJECTS

36.    CHAVEZ has at least 14 prior arrests in New Mexico and Oklahoma with 7 felony convictions for:

      a.   receiving or transferring a stolen motor vehicle, Valencia County Court Case No. D-1314-CR-2006-00226;

      b.   possession of a stolen firearm and tampering with evidence, Valencia County Court Case No. D-1314-CR-2007-00165;

      c.   aggravated fleeing a law enforcement officer, Valencia County Court Case No. D-1314-CR-2008-00234;

      d.   burglary, Bernalillo County Court Case No. D-202-CR-2009-02635;

      e.   burglary, Bernalillo County Court Case No. D-202-CR-2010-00682;

      f.   receiving or transferring a stolen motor vehicle, Bernalillo County Court Case No. D-202-CR-2010-05126; and

      g.   aggravated attempting to elude a police officer and conspiracy to commit a felony, Oklahoma County District Court, State of Oklahoma, Case No. CF-2010-7539.

37.    LARA-YANEZ has 7 prior arrests in New Mexico, Colorado, and Texas with 1 felony conviction for battery upon a peace officer and assault upon a peace officer, Bernalillo County Court Case No. D-202-CR-2019-00822.[7]

38.    MEDINA has five prior arrests in New Mexico with felony convictions for aggravated

---

[7] I have reviewed LARA-YANEZ' electronic court file in that matter and it appears the aforementioned felony conviction was changed from a conditional discharge to a deferred sentence. That court action took place after LARA-YANEZ was found to have an unsatisfactory discharge from probation. All that to say, I am unsure if LARA-YANEZ is a convicted felon. As such, I am not seeking to charge LARA-YANEZ with being a felon in possession of a firearm at this time.

assault with a deadly weapon, negligent use of a deadly weapon, and tampering with evidence, Valencia County Court Case No. D-1314-CR-2019-00643. MEDINA is currently on state probation in relation to those convictions.

## DNA EVIDENCE COLLECTION

39.     I am requesting the Court's permission to collect DNA buccal swabs from JEFFREY ALAN CHAVEZ, aka: "40," GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," and CRYSTAL NICHOLE MEDINA to compare to drug packaging materials collected by an undercover FBI agent, as well as any drug packaging materials or firearms collected during the execution of the requested search warrants.

40.     I am aware the FBI Laboratory requires side-by-side comparisons of evidence and DNA in cases involving known subjects, such as in the instant investigation. I know DNA evidence may easily be transferred to drug packaging materials and firearms. I have utilized such DNA evidence in prior investigations and during jury trials.

## BIOMETRIC ACCESS TO DEVICES

41.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

42.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID,"

which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

43.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

44.    If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

45.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device

than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

46.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

47.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, is inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device may exist for only a short time.

48.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request permission to: (1) press or swipe the fingers (including thumbs) of the Target

Subjects to the fingerprint scanner of the devices found at the Subject Premises; (2) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the facial recognition feature; and/or (3) hold the devices found at the Subject Premises in front of the face of the Target Subjects and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that the Target Subjects state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask the Target Subjects to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

49.     Based on the aforementioned information, I submit that probable cause exists to search the Subject Premises and Target Subjects, described in Attachment A, for the items described in Attachment B, which are evidence, fruits, and instrumentalities of, or property designated for use, intended for use, or used in committing violations of 21 U.S.C. §§ 841(a), 843(b), 846, 856 and 18 U.S.C. §§ 922(g) and 924(c). This affidavit has been reviewed by Assistant United States Attorney Paul Mysliwiec, of the District of New Mexico.

Respectfully submitted,

Bryan Acee
FBI Special Agent

Electronically submitted and telephonically sworn to before me on December 2, 2022.

The Honorable Steven C. Yarbrough
United States Magistrate Judge

**ATTACHMENT A**
**Premises to be Searched**

**8112 Kathryn Street SE, Albuquerque, New Mexico 87108**, which is described as a single-story residence with pink siding. The numbers 8112 are posted on the curb and mailbox in front of the residence. Color photographs are posted below. The search of the Subject Premises shall include the entire residence and all outbuildings, trash cans, storage containers, and vehicles parked at, or in front of, the Subject Premises.[1]



**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a.  Any devices found at the premises, and
b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A

**ATTACHMENT A**
**Premises to be Searched**

**620 Chama Street SE, apartment #E, Albuquerque, New Mexico 87108,** which is described as being a two-story apartment building with tan colored siding. The number 620 is posted on the front of the building and the letter E next to the front door. The search of the Subject Premises shall include the entire apartment and all outbuildings, trash cans, and storage containers designated for use by apartment E, and vehicles parked at, or in front of, the Subject Premises.[1]

 

**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a. Any devices found at the premises, and

b. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments

c. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.

d. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A

**ATTACHMENT A**
**Premises to be Searched**

**1101 High Street SE, apartment #A, Albuquerque, NM 87102** may be described as being a two-story apartment building with tan and red colored siding. The number 1101 is posted on the front and side of the building. Apartment A is located on the north end of the building, and is distinguishable because apartments B, C, and D have letters on the front doors. Apartment A does not have a letter on the door, as it looks like a replacement door. The search of the Subject Premises shall include the entire apartment and all outbuildings, trash cans, and storage containers designated for use by apartment E, and vehicles parked at, or in front of, the Subject Premises.[1]



**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a.  Any devices found at the premises, and
b.  Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c.  for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d.  This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

---

[1] Only vehicles parked at the Subject Premises or in front of the Subject Premises and having an apparent connection to the Subject Premises will be searched. Connection to the Subject Premises may be established by way of prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

Attachment A

**ATTACHMENT A**
**Premises to be Searched**

**Cube Smart Storage, 2001 Girard Boulevard SE, unit D20, Albuquerque, NM 87106** may be described as a commercial storage facility with a large red and white sign in front of the business entrance. Each storage unit is individually marked with letters and numbers. The Subject Premises is marked with designator D20 above the door. The search shall include the entire storage unit and all contents within unit D20.

Note: Law enforcement officers will note the make/model/serial number of any property within unit D20. Such notes may be used to query the property in law enforcement databases and determine the value of the property.

 

**Biometric Access to Devices:** During the execution of the search of the premises described herein, law enforcement are also specifically authorized to compel the DEFENDANT to provide biometric features, including pressing fingers (including thumbs) against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, of:

a. Any devices found at the premises, and
b. Where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments
c. for the purpose of attempting to unlock the devices' security features in order to search the contents as authorized by this warrant.
d. This warrant does not authorize law enforcement personnel to compel any other individuals found at the premises to provide biometric features, as described in the preceding paragraph, to access or otherwise unlock any device. Further, this warrant does not authorize law enforcement personnel to request that the DEFENDANT state or otherwise provide the password or any other means that may be used to unlock or access the devices, including by identifying the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

Attachment A

**ATTACHMENT A**
**Persons to be Searched**

JEFFREY ALAN CHAVEZ, aka: "40," GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," and CRYSTAL
NICHOLE MEDINA, who appear in the photographs below. The Defendants will be searched for DNA evidence
via buccal swabs.



CHAVEZ            LARA-YANEZ            MEDINA

Attachment A

## ATTACHMENT B
### Items to be Seized

**Items to be Seized:** All evidence, fruits, and instrumentalities of violations of: 21 U.S.C. § 841(a) possession with intent to distribute controlled substances; 21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking; 21 U.S.C. § 846 conspiracy to distribute controlled substances; 21 U.S.C. § 856 maintaining drug involved premises; 18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime; and 18 U.S.C. § 922(g) being a prohibited person in possession of a firearm or ammunition, to include the following items:

1. Controlled substances, drug packaging material, paraphernalia, and scales;

2. Firearms, magazines, and ammunition;

3. United States currency;

4. Documentary evidence of drug trafficking, to include records, receipts, notes, ledgers, money orders, money order receipts, pre-paid money cards or other debit cards, and any documents relating to transporting, ordering, purchasing, transporting, or distributing drugs;

5. Cellular telephones;

6. Articles of property tending to establish the identity of persons in control of premises, vehicles, storage areas, and containers being searched, including utility company receipts, rent receipts, addressed envelopes, and keys;

7. Safes, combinations or key-lock strong boxes or other secure storage containers, and types of locked or containers, and hidden compartments that may contain any of the foregoing.

**Persons to be Seized:** DNA evidence will be collected from JEFFREY ALAN CHAVEZ, aka: "40," GERARDO RAFAEL LARA-YANEZ, aka: "ALEX," and CRYSTAL NICHOLE MEDINA via buccal swabs.